UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARIEL WATT,<br><br>Plaintiff,<br><br>v.<br><br>VILLAGE PLACE APARTMENTS and EDWARD ROSE & SONS,<br><br>Defendants. | NO. 1:26-CV-00637<br><br>Judge Edmond E. Chang |

## MEMORANDUM OPINION AND ORDER

Ariel Watt sued her landlord, Village Place Apartments and Edward Rose & Sons (the Court will collectively refer to the Defendants as Village Place), in state court after Village Place refused to sign a contract so that Watt could pay her rent with a housing voucher. R. 1-2, Defs.' Exh. A, Am. Compl. ¶¶ 1–3, 16.[1] She brings claims for source-of-income and race discrimination in violation of the Illinois Human Rights Act, 775 ILCS 5/3-102(A)–(B), and breach of contract. Am. Compl. ¶¶ 29–56. Village Place removed the case to federal court. R. 1, Not. of Removal. Watt moves to remand, R. 14, Pl.'s Mot., arguing that the Court lacks subject matter jurisdiction, R. 15, Pl.'s Br. at 3–12. The Court is unable to determine Village Place's citizenship based on the current allegations, which in turn determines whether the Court has diversity jurisdiction. Thus, the motion is terminated without prejudice for now, and

[1] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

Village Place is ordered to file a supplemental jurisdictional memorandum to provide the missing citizenship information.

## I. Background

Watt participates in the Housing Choice Voucher program administered by the Department of Housing and Urban Development and the Housing Authority of Joliet. Am. Compl. ¶ 3. The program provides vouchers for low-income households to pay rent to private landlords. *Id.* ¶ 4.

In April 2025, Watt applied to rent one of Village Place's apartment units. Am. Compl. ¶ 5. At that time, a Village Place leasing agent told Watt that the building accepted housing vouchers. *Id.* ¶ 6. After Watt applied, another Village Place agent allowed the Housing Authority to inspect and approve the unit for Watt's habitation. *Id.* ¶ 7. A Village Place agent then completed and signed paperwork sent by the Housing Authority. *Id.* ¶¶ 8–12. In June 2025, the Housing Authority sent an email offer to Village Place, explaining that it would pay $2,234 each month to cover Watt's entire monthly rent. *Id.* ¶ 13. Village Place accepted. *Id.* ¶ 14. So the Housing Authority sent a Housing Assistance Payment contract to Village Place. *Id.* ¶ 15. The Housing Choice Voucher program requires landlords to sign this contract—along with the lease—so that the Housing Authority can make rent payments directly to landlords on behalf of program participants. *Id.*

Village Place did not immediately sign the Housing Assistance Payment contract. Am. Compl. ¶¶ 16–17. Still, relying on its representation that it would accept her voucher, Watt signed a lease with Village Place and moved into the apartment

unit in June 2025. *Id.* ¶ 19. That month, the Housing Authority also paid Village Place a $1,100 security deposit on Watt's behalf. *Id.* ¶ 20.

In July 2025, Village Place informed Watt that her July rent had not been paid. Am. Compl. ¶ 21. Watt contacted the Housing Authority, which told her that it could not pay her rent until Village Place signed the Housing Assistance Payment contract. *Id.* ¶ 22. So in August 2025, Watt emailed Village Place to ask about the contract. *Id.* ¶ 23. For the first time, Village Place told Watt that it had a policy against entering into agreements with third parties, and thus would not sign the contract. *Id.* ¶¶ 16–17, 23–24. Because Watt's rent was still unpaid, Village Place filed a suit to evict her. *Id.* ¶ 28; R. 15-1, Pl.'s Exh. A, Eviction Compl.

In November 2025, Watt filed a complaint in Illinois state court, asserting state civil rights and breach-of-contract claims. Not. of Removal ¶ 2; *see also* Am. Compl. She also sought a temporary restraining order to prevent Village Place from evicting her. Not. of Removal ¶ 3; R. 1-4, Defs.' Exh. C, Pl.'s Am. Mot. for TRO. Watt's case was consolidated with Village Place's eviction action. *See* R. 1-5, Defs.' Exh. D, State Dkt.; R. 15-2, Pl.'s Exh. B, 11/17/2025 Order. Then Village Place removed the case to federal court. *See generally* Not. of Removal. Watt has not been evicted, and still resides in her Village Place apartment unit. Am. Compl. ¶ 1.

## II. Analysis

### A. Timeliness of Removal

A defendant seeking to remove a state case to federal court must file the notice of removal within 30 days of receiving a copy of the pleading. 28 U.S.C. § 1446(b)(1).

In her brief, Watt contends that Village Place Apartments failed to file a timely notice of removal. Pl.'s Br. at 2–3. She says that she served Village Place Apartments on December 12, 2025, but the Notice of Removal was not filed until January 20, 2026—39 days later. *Id.* Village Place argues that Watt improperly served a leasing agent at the apartment building, rather than its registered agent. Not. of Removal at 2 n.2. So in its view, neither defendant was properly served until December 18, 2025, when defense counsel accepted service on behalf of both defendants. *Id.*

The Court need not resolve this issue because even if the Notice of Removal was not timely for Village Place Apartments, it was timely for Edward Rose & Sons. *See* Pl.'s Br. at 3 (agreeing that Edward Rose & Sons timely filed the Notice of Removal on January 20, 2026, based on service to defense counsel on December 18, 2025).[2] Because Edward Rose & Sons filed a timely Notice of Removal, and Village Place Apartments consented, the removal was proper. *See* 28 U.S.C. § 1446(b)(2)(C) ("If defendants are served at different times, and a later-served defendant files a notice of removal, any earlier-served defendant may consent to the removal even though that earlier-served defendant did not previously initiate or consent to removal.").

In any event, Watt mentions this issue only in passing, so it is forfeited. *See Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, 135 F.4th 572, 587 n.5 (7th Cir. 2025) (holding that underdeveloped arguments may be forfeited); *GE Betz, Inc.*

[2]Thirty days after December 18, 2025 was January 17, 2026, which was a Saturday. Monday, January 19, 2026, was a federal holiday, so Tuesday, January 20, 2026, was the last day that Edward Rose & Sons could file a timely notice of removal.

*v. Zee Co., Inc.*, 718 F.3d 615, 625–26 (7th Cir. 2013) (holding that statutory defects to removal are waived if the plaintiff does not raise them within 30 days of removal). Timeliness is not a barrier to the removal of this case.

**B. Diversity Jurisdiction**

Turning to the jurisdictional issue, Village Place first argues that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a). R. 17, Defs.' Resp. Br. at 4–9. The Court has diversity jurisdiction if (1) the amount in controversy exceeds $75,000, and (2) there is complete diversity of citizenship between the parties. 28 U.S.C. § 1332(a). The Court addresses each element in turn.

**1. Amount in Controversy**

In a removal case, the defendant bears the burden of showing that the amount in controversy exceeds $75,000. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510–11 (7th Cir. 2006). To do so, they must make a good-faith estimate of the amount in controversy that is "plausible and supported by a preponderance of the evidence." *Id.* at 511. "Once the defendant in a removal case has established the requisite amount in controversy, the plaintiff can defeat jurisdiction only if it appears to a legal certainty that the claim is really for less than the jurisdictional amount." *Id.* (cleaned up).[3]

Here, Village Place argues that three types of relief aggregate to an amount in controversy that exceeds $75,000: damages, injunctive relief, and attorneys' fees.

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Defs.' Resp. Br. at 5–9. Watt contests that any of the categories of relief, alone or taken together, exceed $75,000. Pl.'s Br. at 3–8.

**a. Damages**

Watt seeks damages for Village Place's alleged violations of the Illinois Human Rights Act. Am. Compl. at 6, 8–9. The Act permits plaintiffs to recover actual and punitive damages. 775 ILCS 5/10-102(C)(1). Actual damages include damages for emotional distress, *Vill. of Bellwood Bd. of Fire & Police Comm'rs v. Hum. Rts. Comm'n*, 541 N.E.2d 1248, 1258 (Ill. App. Ct. 1989), which Watt alleges she has experienced, Am. Compl. ¶¶ 38, 46, 52. And Watt has not disclaimed that she may seek punitive damages. *See* Defs.' Resp. Br. at 6–7; R. 24, Pl.'s Reply Br. at 4.

But the fact that Watt can recover these *types* of damages does not shed light on the *amount* that Watt could plausibly recover. Village Place cites *Cooper v. Chicago Housing Authority*, 2025 WL 1677764 (N.D. Ill. June 13, 2025), as evidence that Watt may recover significant damages. Defs.' Resp. Br. at 6. In that case, Cooper sued the Chicago Housing Authority for failing to accommodate her late daughter's disability, and the parties settled for $525,000. *Cooper*, 2025 WL 1677764, at *1.

But *Cooper* is distinguishable from this case. There, the Chicago Housing Authority failed to provide Cooper and her daughter a wheelchair-accessible unit for over two years. *Cooper*, 2025 WL 1677764, at *1. Because their apartment was inaccessible, and Cooper cared for her daughter full time, they were both "essentially … homebound" for years. *Id.* at *2. Whereas here, Watt sued shortly after receiving her eviction notice, and she has not been evicted. Am. Compl. ¶¶ 1, 28; Pl.'s

Br. at 6. Because Watt remains in her apartment without incident, her damages are likely much more limited. Thus, *Cooper* does not offer "competent proof" about the amount of damages Watt may recover. *See Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 427 (7th Cir. 1997) (cleaned up).

Besides *Cooper*, neither party provides an estimate for damages. Watt primarily argues that her damages will be limited because she has not been evicted from her apartment. Pl.'s Br. at 6. But it is still possible that Watt could recover *some* amount in damages. Ultimately, because it is Village Place's burden to provide a good-faith estimate of damages, and it does not do so, it cannot rely on this category of relief to show that the amount in controversy exceeds $75,000.

**b. Injunctive Relief**

"In a suit for injunctive relief, the amount in controversy is measured by the value of the object of the litigation." *Macken ex rel. Macken v. Jensen*, 333 F.3d 797, 799 (7th Cir. 2003) (cleaned up). "[T]he object may be valued from either perspective—what the plaintiff stands to gain, or what it would cost the defendant to meet the plaintiff's demand." *Id.* at 799–800.

Here, Watt asks the Court to order Village Place to sign her Housing Assistance Payment contract, to enjoin Village Place from taking action to evict her based on non-payment of rent, and to order Village Place to alter its rental policies and procedures to comply with the Illinois Human Rights Act (in other words, to accept housing vouchers). Am. Compl. at 6, 8–10. Warren Rose, who is purportedly a member of one of the limited liability companies in the chain of ownership for Village Place

Apartments (more on that later), submitted a declaration attesting that it would cost over $75,000 to comply with this injunctive relief. R. 1-7, Defs.' Exh. F, Rose Decl. ¶¶ 4, 10–11. Specifically, Rose says that Village Place Apartments would have to retain a specialist to ensure compliance with the Housing Choice Voucher program, which would cost around $36,400 each year. *Id.* ¶ 5. Rose also says that the building would have to spend another $2,500 to $5,000 a year paying its hourly employees to attend trainings on the voucher program. *Id.* ¶¶ 6–7. In total, it would cost between $38,900 and $41,400 each year to comply with Watt's requested injunctive relief at Village Place Apartments. *Id.* ¶ 9. And these expenses are estimates for only Village Place Apartments—Village Place owns eight other apartment buildings in Illinois. *Id.* ¶ 9; Pl.'s Br. at 6.[4] So any injunctive relief that forces Village Place to comply with the Illinois Human Rights Act would apply to all of its buildings in the state, multiplying these costs to hundreds of thousands of dollars. Rose Decl. ¶ 9. Finally, company-wide, Rose says that Village Place would also incur over $75,000 in legal expenses to redevelop its policies to comply with the voucher program. *Id.* ¶ 8.

In response to Rose's declaration, Watt cites *Cole v. Timberbrook Realty, LLC*, 2025 WL 2814707 (C.D. Ill. Oct. 3, 2025), which involved a source-of-income discrimination claim against another Village Place property. *Id.* at *1–2. There, too, Village Place removed the case to federal court and the plaintiff moved to remand, arguing

[4]Rose's declaration estimates compliance costs across all of its properties in the United States, Rose Decl. ¶ 9, but as Watt notes, the Illinois Human Rights Act applies only to its properties in Illinois, Pl.'s Br. at 6.

that the amount-in-controversy requirement was not met. *Id.* at *1. The plaintiff sought similar injunctive relief, and Village Place submitted an affidavit from the apartment building's CEO attesting that the cost of complying with the injunctive relief would exceed $75,000. *Id.* at *2. But the affidavit in *Cole* was entirely conclusory. *Id.* (stating that "while a precise figure cannot be calculated, the aggregate cost … to implement company-wide operational changes, enter the requisite third-party agreements, and retain personnel as demanded by Plaintiff … would exceed $75,000."). Because Village Place "provide[d] no facts whatsoever to back up" its assertions about compliance costs, the district court concluded it had not established by a preponderance of the evidence that the amount in controversy exceeded $75,000. *Id.* at *2.

In contrast, here Rose's declaration provides a detailed estimate of the costs that Village Place would incur to comply with Watt's requested injunctive relief. He describes the actions that Village Place would take—including hiring a compliance specialist, training hourly employees, and paying in-house and outside counsel—and how much those actions would cost (in some instances, with specific hourly rates). *See* Rose Decl. ¶¶ 5–9. Watt offers no evidence to directly counter or refute Rose's declaration. Because the declaration is specific and plausible, it offers competent proof that it is more likely than not that Village Place would spend over $75,000 to comply with the requested injunctive relief.

Watt argues that the estimated compliance costs are implausible because Village Place has previously accepted tenants with housing vouchers. Pl.'s Br. at 4–6.

Indeed, Watt introduces evidence that six of Village Place's Illinois apartment buildings—including Village Place Apartments—accepted housing vouchers in recent years. *See* Pl.'s Reply Br. at 1–2; R. 15-3, Pl.'s Exh. C, Vill. Pl. FOIA; R. 15-4, Pl.'s Exh. D, Fox Pointe FOIA; R. 15-5, Pl.'s Exh. E, Timberbrook FOIA; R. 15-6, Pl.'s Exh. F, Beacon Hill FOIA; R. 15-7, Pl.'s Exh. G, Montgomery Pl. FOIA; R. 24-1, Pl.'s Reply Br. Exh. A, Hunters Pond FOIA. Watt contends that Village Place must already have systems in place to accept housing vouchers, so it will not cost thousands of dollars to comply with the requested injunctive relief. But the fact that Village Place previously accepted tenants with housing vouchers does not disprove that it would cost money to *resume* accepting vouchers. For example, hiring a compliance specialist to ensure compliance with the program appears to be an ongoing cost, not a one-time cost that the Village Place has already incurred. That makes some sense; federal law governing the Housing Choice Voucher program may change over time, requiring ongoing efforts to ensure compliance. So although Watt's evidence might cast some doubt on Rose's declaration, it does not tip the scales in her favor.

In sum, based on Rose's declaration, Village Place has presented a good-faith estimate—supported by a preponderance of the evidence—that the value of the injunctive relief exceeds $75,000. Watt has not shown that this amount is legally impossible. Thus, the amount-in-controversy requirement is met.

**c. Attorneys' Fees**

Watt also seeks reasonable attorneys' fees and costs. Am. Compl. at 6, 8–9. She estimates that she accrued approximately $7,500 in attorneys' fees up to the time of

removal. *See* Pl.'s Reply Br. at 4 (estimating that approximately 25 attorney hours were spent at a rate of $300 per hour); R. 24-2, Pl.'s Reply Br. Exh. B, Lowe Affidavit ¶ 4; R. 24-2, Pl.'s Reply Br. Exh. B, Liss Affidavit ¶ 5. Because the amount-in-controversy requirement is met by the value of the injunctive relief, the attorneys' fees are not dispositive. But because "attorneys' fees up to the time of removal also count toward the jurisdictional amount," this evidence further supports Village Place's good-faith estimate that the amount in controversy exceeds $75,000. *Oshana*, 472 F.3d at 512.

**2. Diversity of Citizenship**

To establish diversity jurisdiction, the parties must also be completely diverse in citizenship. *Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 636 (7th Cir. 2021). Watt is an Illinois citizen. Not. of Removal ¶ 8. But Village Place did not adequately allege its citizenship in its Notice of Removal, so the Court requested more information. *See* R. 19, Juris. Inquiry. Village Place filed a jurisdictional memorandum. *See* R. 20, Juris. Memo. But there are still several gaps and contradictions in Village Place's allegations that make it impossible for the Court to determine its citizenship.

As a reminder, there are two defendants in this case: Village Place Apartments (the apartment building where Watt lives) and Edward Rose & Sons (which Watt alleges owns Village Place Apartments). *See* Am. Compl. ¶¶ 1–2.[5] For the first

[5]Based on Watt's allegations, Village Place Apartments does not appear to be its own legal entity. *See* Am. Compl. ¶¶ 1–2. "When a business … does not have a separate corporate existence from its owner, courts look to the [owner] as the entity that matters in establishing

defendant, the Notice of Removal alleges that Village Place Apartments is owned by Romeoville Properties, LLC. Not. of Removal. ¶ 10. An LLC's citizenship for purposes of diversity jurisdiction is the citizenship of each of the LLC's members. *Wise v. Wachovia Secs., LLC*, 450 F.3d 265, 267 (7th Cir. 2006). So the Notice of Removal further alleges that Romeoville Properties, LLC has two members: Edward Rose Development Co., LLC and Jacobson Romeoville, LLC. Not. of Removal ¶ 11. In turn, the Notice alleges that Edward Rose Development Co., LLC has one member, Warren Rose, who is a Michigan citizen. *Id.* ¶ 13. And Jacobson Romeoville, LLC has one member, Scott Jacobson, who is also a Michigan citizen. *Id.* ¶ 14. Thus, based on the individual members' citizenships, Edward Rose Development Co., LLC and Jacobson Romeoville, LLC are Michigan citizens, making Romeoville Properties, LLC also a Michigan citizen. *Id.* ¶¶ 11, 15. But here lies the first problem: the jurisdictional memorandum alleges a *different* citizenship for Edward Rose Development Co., LLC. There, Village Place alleges that the LLC is a citizen of Michigan *and Florida* based on the citizenship of multiple members (none of whom are Warren Rose). Juris. Memo. ¶ 15. Because there are inconsistent allegations about the citizenship of Edward Rose Development Co., LLC, the citizenship of Romeoville Properties, LLC remains unclear.

Further complications arise with the second defendant, Edward Rose & Sons. The Notice of Removal alleges that "Edward Rose & Sons is the tradename for

---

diversity jurisdiction." *Giles v. WEEK TV*, 2016 WL 1170897, at *2 (C.D. Ill. Mar. 24, 2016) (citing *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 n.3 (7th Cir. 1986)).

multiple entities." Not. of Removal ¶ 9. At the request of the Court, Juris. Inquiry, the jurisdictional memorandum identifies those entities and, for each entity, lists their members and those members' citizenships, *see generally* Juris. Memo. For almost every entity, the identified members are trusts, and Village Place simply notes each trust's name and state of citizenship. *See generally id.* But a trust's citizenship is based on the citizenship of its trustees or members (depending on the type of trust). *See Americold Realty Tr. v. Conagra Foods, Inc.*, 577 U.S. 378, 382–83 (2016). So when an LLC's members are trusts, the LLC must dig another layer deep to properly allege the trusts' citizenship. *See RTP LLC v. ORIX Real Est. Cap., Inc.*, 827 F.3d 689, 691 (7th Cir. 2016) (noting that because an LLC's members were retirement-fund trusts, "whether th[e] suit was removable depends on the citizenships of" those trusts, which in turn depends on the citizenships of the trusts' members); *see also GBForefront, L.P. v. Forefront Mgmt. Grp., LLC*, 888 F.3d 29, 41 (3d Cir. 2018) ("The rules for determining citizenship do not change depending on whether a trust is embedded within another business entity.").

The rules governing a trust's citizenship require brief explanation. For many years, the Seventh Circuit held that "[t]he citizenship of a trust is that of the trustee." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006). But in 2016, the Supreme Court clarified that that was not always the rule. *See Americold*, 577 U.S. at 382–83. "Traditionally, a trust was not considered a distinct legal entity" and could not "be haled into court; legal proceedings involving a trust were brought by or against the trustees in their own name." *Id.* at 383. Thus, for traditional trusts, the

Supreme Court enforced "a separate rule that when a trustee files a lawsuit in *her* name, her jurisdictional citizenship is the State to which she belongs—as is true of any natural person." *Id.* at 382–83 (emphasis in original) (citing *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 465 (1980)). But in recent years, "[m]any States … have applied the 'trust' label to a variety of unincorporated entities that have little in common with" traditional trusts. *Id.* at 383. For those entities, the "oft-repeated rule that" an unincorporated entity "possesses the citizenship of all its members" still applies. *Id.* (cleaned up). In sum, courts must determine whether a trust is a traditional or business trust, which in turn determines whether the trust's citizenship is based on the citizenships of its trustees or its members, respectively. *Id.*

The Supreme Court and Seventh Circuit have not yet provided detailed guidance about how to distinguish a traditional trust from a business trust. But when applying the rule outlined in *Americold*, both courts have primarily assessed whether the entity could litigate in its own name. *See Americold*, 577 U.S. at 383; *RTP*, 827 F.3d at 691–92. As other circuits have put it, "a traditional trust is a trust that lacks juridical person status"—meaning it cannot sue and be sued in its own name—whereas a business trust has juridical person status. *See, e.g.*, *Wang ex rel. Wong v. New Mighty U.S. Trust*, 843 F.3d 487, 495 (D.C. Cir. 2016). Courts look to "the law of the state where the trust is formed" to determine whether a trust has juridical status. *Id.*; *see Americold*, 577 U.S. at 383 (examining state law to determine whether the trust could sue or be sued in its own name). So here, at minimum, for each trust that is a member of one of Edward Rose & Sons' LLCs, the Court must know whether the

trust can litigate in its own name under the law of the state where the trust was formed.

Circuit courts have outlined additional factors that may be considered to determine the trust type. For instance, when concluding that investment-fund trusts were business trusts, the Seventh Circuit also noted that the trusts could contract in their own name, and that the trusts—not the trustees—were the members of the party LLCs in the case. *See RTP*, 827 F.3d at 692. Other courts have examined "whether the trustee possesses real and substantial control over the trust's assets, and the rights, powers, and responsibilities of the trustee, as described in the controlling agreement." *Demarest v. HSBC Bank USA, N.A., as Tr. for the Registered Holders of Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-HE2*, 920 F.3d 1223, 1229–30 (9th Cir. 2019) (citation omitted). Courts may also consider "the purpose of the trust—a traditional trust facilitates a donative transfer, while a business trust implements a bargained-for exchange." *GBForefront*, 888 F.3d at 40 (citation omitted). This information would also help the Court determine whether the trusts at issue here are traditional or business trusts.

If the Court determines that any of the Edward Rose & Sons' LLCs' trusts are business trusts, then the Court will also have to determine who counts as a "member." Again, the Supreme Court and Seventh Circuit have not offered much guidance on this issue. *See Americold*, 577 U.S. at 381 ("Despite our oft-repetition of the rule linking unincorporated entities with their 'members,' we have never expressly defined the term."). In previous cases, the Supreme Court has "equated an association's

members with its owners or the several persons composing such association," and thus "identified the members of a joint-stock company as its shareholders, the members of a partnership as its partners, the members of a union as the workers affiliated with it, and so on." *Id.* (cleaned up). In *Americold*, the Supreme Court held that the members of a real estate investment trust included its shareholders. *See id.* at 382 (explaining how, like the shareholders of a joint-stock company or partners of a limited partnership, the trust's shareholders "have ownership interests and votes in the trust" (cleaned up)). And the Seventh Circuit has concluded that the members of a retirement-plan trust included the plans' beneficiaries because they "have financial interests in the pension trusts." *RTP*, 827 F.3d at 692. So to define and identify the members of any modern trust, the Court must also know some basic information about the trust's financial structure and which individuals have a financial stake in it.

As noted above, the jurisdictional memorandum offers none of this information. *See generally* Juris. Memo. It provides no details necessary to determine the types of trusts that are members of the Edward Rose & Sons LLCs, such as the governing state law and whether the trusts can litigate in their own names. Nor does it provide information about the identities and citizenships of those trusts' trustees or members. Without those details, the Court cannot determine the LLCs' citizenships. *See Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007) ("[A]n LLC's jurisdictional statement must identify the citizenship of each of its members as of the date the … notice of removal was filed, and, if those members have members, the

citizenship of those members as well."); *see also 4900 Morse Land Tr. v. Occidental Petroleum Corp.*, 2023 WL 1990076, at *4–5 (N.D. Ind. Feb. 14, 2023).

Finally, the jurisdictional memorandum also does not adequately allege the citizenship of several *corporations* operating under the Edward Rose & Sons trade name. The jurisdictional memorandum says that the trade-name entities are "either an LLC or a corporation." Juris. Memo. at 1. Three entities appear to be corporations: Edward Rose Building Co., Edward Rose Realty, Inc., and Edward Rose Associates, Inc. *See id.* ¶¶ 2, 7, 9. Unlike an LLC, whose citizenship is defined by the citizenship of its members, a corporation's citizenship is defined by its place of incorporation and principal place of business. *See Thomas*, 487 F.3d at 533–34. But for each of the three corporate entities, the jurisdictional memorandum lists their members' citizenships. *See* Juris. Memo. ¶¶ 2, 7, 9. Instead, Village Place must allege those corporations' places of incorporation and principal places of business.

Because of these inconsistencies and missing allegations, the Court is unable to determine the citizenship of either defendant, and thus whether it has diversity jurisdiction under 28 U.S.C. § 1332(a).

**C. Federal Question Jurisdiction**

Village Place alternatively argues that the Court has subject matter jurisdiction under 28 U.S.C. § 1331. Defs.' Resp. Br. at 10–12. "[F]ederal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action created bv federal law." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). And Watt brings only state law claims. *See* Am. Compl. ¶¶ 29–56. But "in certain

cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable*, 545 U.S. at 312. This limited exception applies when a state law claim "necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314.

Village Place argues that two federal questions arise in this case which establish federal-question jurisdiction: First, whether federal law preempts the Illinois Human Rights Act's requirement that landlords participate in the Housing Choice Voucher program by prohibiting discrimination based on an individual's source of income. Defs.' Resp. Br. at 10–12. Second, whether the Act violates the Fourth Amendment and the Fourteenth Amendment's Due Process Clause (by requiring landlords like Village Place to grant government access to their records and buildings). *Id.*

But neither of these issues are necessarily raised by Watt's state law claims. Instead, these are merely Village Place's *defenses* that rest on federal law, which is not enough to establish federal-question jurisdiction under *Grable*. *See Chicago Trib. Co. v. Bd. of Trs. of Univ. of Ill.*, 680 F.3d 1001, 1003–04 (7th Cir. 2012). The cases on which Village Place relies do not apply here. For example, in *Evergreen Square of Cudahy v. Wisconsin Housing & Economic Development Authority*, 776 F.3d 463, 467 (7th Cir. 2015), because the plaintiff alleged that the defendant breached federal housing contracts, the case necessarily raised questions about the interpretation of those contracts and related federal regulations and statutes. *Id.* Whereas here, the

core of Watt's claim rests on state law prohibiting source-of-income discrimination—not on the interpretation of housing voucher contracts, federal regulations, or any other federal law.

What's more, this case raises a novel question of state law—namely, whether the Illinois Human Rights Act's definition of "source of income" includes housing vouchers. *See* Pl.'s Br. at 12. So deciding this case may disturb the balance between federal and state court. Thus, Village Place does not meet several of the elements of the *Grable* test. There is no federal-question jurisdiction.

### D. Supplemental Jurisdiction

Finally, Watt argues that even if there is subject matter jurisdiction, the Court should decline to exercise its jurisdiction under 28 U.S.C. § 1367(c). This statute allows district courts to "decline to exercise supplemental jurisdiction over a claim" if "the claim raises a novel or complex issue of State law." *Id.* § 1367(c)(1). But Section 1367 deals with *supplemental* jurisdiction over state law claims, not *original* jurisdiction. *See id.* § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."). So if the Court has original jurisdiction under 28 U.S.C. § 1332(a), it cannot decline to exercise its jurisdiction under section 1367. This statutory provision is inapplicable.

### E. Supplemental Jurisdictional Memorandum

As described earlier in this Opinion, the Court lacks the necessary information to determine whether there is complete diversity of citizenship, which is the only potential path to subject matter jurisdiction. Thus, Village Place shall file a supplemental jurisdictional memorandum containing the following information: first, Village Place must clearly identify the citizenship of Edward Rose Development Co., LLC by identifying its members and their citizenships. Second, for each LLC operating under the Edward Rose & Sons trade name, Village Place must identify the LLC's members and their citizenships with the requisite level of detail. Namely, if the LLC's members are trusts, Village Place must provide information sufficient to identify the *type* of trust, such as the relevant governing state law. Depending on whether the trust is a traditional or business trust, Village Place must then provide the identities and citizenships of the trustees or members, respectively. And for business trusts, Village Place must also provide information about the trust's financial structure so that the Court can identify who counts as a member. Third, for each corporation operating under the Edward Rose & Sons trade name, Village Place must identify the corporation's place of incorporation and principal place of business.

Village Place must also file a brief in support of its contention that there is complete diversity of citizenship. For each trust, Village Place must take a position on the trust's type. And for any business trusts, Village Place must take a position as to the definition of the trust's members. Watt must file a response brief.

After the parties' briefing, the Court will determine whether there is complete diversity of citizenship. In the meantime, Watt's motion to remand is denied without

prejudice. Because the Court has an independent obligation to assure itself of its subject matter jurisdiction, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), Watt need not renew her motion to remand after the briefing is completed. But this is the **final** chance for Village Place to establish diversity of citizenship.

The Court also notes that it provisionally permitted Village Place to file its jurisdictional memorandum under seal. *See* R. 23, 03/24/2026 Minute Order. If Village Place wishes to file the supplemental jurisdictional memorandum under seal, then it must file a sealed version, redacted version, and a motion to maintain the seal consistent with Local Rule 26.2. The Court will then consider whether the jurisdictional memorandum and the supplemental jurisdictional memorandum can be maintained under seal. But "only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), [are] entitled to be kept secret." *Baxter Int'l, Inc. v. Abbott Lab'ys.*, 297 F.3d 544, 546 (7th Cir. 2002). Generic assertions that information is "commercially sensitive" are inadequate to establish that the information is a protectable trade secret. *See id.* at 545–46. The Court thus cautions that Village Place faces an uphill battle to prove that there is "good cause" to keep the jurisdictional information under seal. *See FractureLabs Oü v. Jump Trading, LLC*, 2025 WL 1582429, at *2–4 (N.D. Ill. June 4, 2025).

## III. Conclusion

Because the Court lacks information to determine whether it has diversity jurisdiction under 28 U.S.C. § 1332(a), the motion to remand, R. 14, is terminated without prejudice. Instead, on or before September 15, 2026, Village Place shall file a supplemental jurisdictional memorandum and brief in support of diversity of citizenship. On or before September 25, 2026, Watt shall file a response brief.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 4, 2026